

**IN THE
TENTH COURT OF APPEALS**

No. 10-22-00278-CV

**IN THE INTEREST OF J.A.S. AND J.A.S., CHILDREN**

**From the 335th District Court
Burleson County, Texas
Trial Court No. 30,583**

**MEMORANDUM  OPINION[1]**

Mary and Dan appeal from a judgment that terminated their parental rights to

their children, J.A.S. (hereinafter referred to as "Bob") and J.A.S. (hereinafter referred to

as "Gail"). According to the judgment, Mary's parental rights were terminated pursuant

to Section 161.001(b)(1)(D), (E), (N), and (O) and a finding that termination was in the

best interest of the children. Dan's parental rights were terminated pursuant to Section

161.001(b)(1)(D), (E), and (O) and a finding that termination was in the best interest of the

children. Mary and Dan complain that the evidence was legally and factually insufficient

---

[1] In this proceeding we will use aliases for the parents and the children.  TEX. R. APP. P. 9.8(b)(2).

to support the jury's findings as to Section 161.001(b)(1)(D), (E), and (O) and best interest as to each of them.  Because we find that the evidence was legally and factually sufficient as to Section (b)(1)(E) and best interest, we affirm the judgment of the trial court.[2]

STANDARD OF REVIEW

The standards of review for legal and factual sufficiency in cases involving the termination of parental rights are well established and will not be repeated here.  *See In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency); *see also In re J.O.A.*, 283 S.W.3d 336, 344-45 Tex. 2009).  If the evidence is sufficient as to one ground, it is not necessary to address other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is necessary to affirm a termination judgment.  *In re N.G.*, 577 S.W.3d 230, 232-33 (Tex. 2019).

**SECTION 161.001(b)(1)(E)**

In Mary's second and Dan's first issue, Mary and Dan complain that the evidence was legally and factually insufficient to support the jury's findings pursuant to Section 161.001(b)(1)(E).  Section 161.001(b)(1)(E) allows termination of parental rights if the factfinder finds by clear and convincing evidence that the parent "engaged in conduct or

---

[2] Because we have found that the evidence was sufficient as to Section 161.001(b)(1)(E), a ground we would be required to address regardless of Mary's failure to preserve the appellate complaint regarding Section 161.001(b)(1)N), we do not need to otherwise address subsection (N) in this opinion. *See In the Interest of N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). An endangerment finding often involves physical endangerment, but it is not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Rather, the specific danger to the child's well-being may be inferred from a parent's misconduct alone." *Id*. In our endangerment analysis pursuant to Section 161.001(b)(1)(E), we may consider conduct both before and after the Department removed the children from a parent. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although significant, evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a parent's history of drug use and irresponsible choices. *See In re J.F.-G.*, 627 S.W.3d 304, 316-17 (Tex. 2021).

Evidence of drug use may constitute evidence of endangerment. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The failure to provide appropriate medical care for or to appropriately feed a child may also be considered conduct that endangers a child. *In re D.E.*, 761 S.W.2d 596, 600 (Tex. App.—Fort Worth 1988, no writ). This is true even if the parent did not cause the condition that requires medical treatment. *In re S.H.A.*, 728 S.W.2d 73, 88 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Further, the failure to administer

medically necessary medication to a child can also qualify as endangerment. *See In re J.I.G.*, No. 01-18-00023-CV, 2018 Tex. App. LEXIS 4960, 2018 WL 3233874, at *8 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.).

The first time Bob was removed from Mary and Dan by the Department was shortly after his birth. Bob tested positive for methamphetamines at birth and had medical issues due to Mary's drug use and possibly alcohol abuse while she was pregnant with him. Bob suffered primarily from a seizure disorder which required regular medication and continued medical care, but he also had other physical, mental, and emotional issues caused by Mary's drug use while she was pregnant with him that would also require long-term specialized care. Bob was returned to Mary and Dan after they completed their service plans and the Department was dismissed as conservators of Bob. Gail was born around the time that the first case was dismissed.

The events leading to the second removal of Bob began when Bob was taken to the emergency room by Dan for an elbow injury he had sustained the prior day. Dan and Mary contend that Bob, who was two years old at that time, fell off a trampoline which caused the elbow injury. Bob was discharged with instructions to consult an orthopedic specialist. Mary testified that no appointments were available for approximately two weeks after Bob's discharge, but that she took him to that doctor. The orthopedic doctor she saw told her that she needed to see a different pediatric orthopedic specialist. Mary testified that she was unable to get an appointment with this doctor for several weeks.

Bob was taken to his pediatrician for a COVID test prior to having an MRI on his elbow. Due to insurance requirements, the pediatrician was also required to conduct a well-child examination that was past-due. Bob had on a mask when he was brought into the pediatrician's office, which, according to the doctor, Mary did not want removed. When the mask was removed, the doctor observed that a significant part of Bob's septum (the area between the nostrils connecting the middle of the nose to the face) was missing and the injury was bleeding and looked possibly infected. There was no injury to the tip of Bob's nose. When asked about the injury, the pediatrician testified that Mary told the doctor that it resulted from a dog bite. The pediatrician did not believe this explanation because of the lack of further injury on the tip of the nose.

The pediatrician's exam also showed that Bob was suffering from "cauliflower ear" on both ears but primarily to his right ear, which appeared to not be a recent injury but had been untreated.[3] The pediatrician opined that the injury would have caused severe swelling, extreme pain, and would have turned the ear purple. If treated within a few hours of the injury, an ENT (Ear, Nose, and Throat) doctor could drain the injured area and it would not be as severe.

The examination by the pediatrician also showed that Bob had unexplained scratches and scarring on his stomach and bruising on his back. Blood tests were also

---

[3] "Cauliflower ear" is a term used to explain an impact injury to the ear which results in swelling that if left untreated, causes permanent damage to the outer ear. The injury is commonly found in professional boxers.

conducted, which showed that the anti-seizure medicine prescribed to Bob that was necessary to prevent seizures was not present in Bob's blood at all. The blood tests also showed that Bob had such a high level of Vitamin D that it did not register on the tests, which had led to high levels of calcium, phosphorus, and magnesium. High levels of calcium, phosphorus, and magnesium could cause severe consequences, including seizures, if left untreated. Additionally, Bob had low albumin and iron levels, which was likely the result of poor protein intake and a bad diet. Bob had been prescribed a vitamin D supplement because his levels were low at a previous visit; however, the amount prescribed would not lead to the extreme level present in Bob's blood.

The pediatrician was so horrified by the state of Bob's injured nose that she immediately called a colleague who was a pediatric ENT doctor to get Bob an immediate appointment to be seen. However, Mary told the pediatrician that she could not take Bob right away because she had to take lunch to Dan. The specialist agreed to see Bob whenever Mary could arrive that day. Photographs of Bob's nose, ear, and his torso showing the doctor's concerns were taken at the pediatrician's office and were admitted into evidence.

Mary later stated that the nose injury was caused by a fever blister and that she had been treating it for approximately two weeks with Neosporin per the instructions of the nurse at the pediatrician's office. The pediatrician testified that there was no record of Mary contacting her office. The pediatrician also testified that Mary told her that she

had not sought medical treatment when the injury first became apparent because she knew that she would be seeing the doctor in a couple of weeks, but the injury was not mentioned by Mary at the visit until the doctor removed Bob's mask and was shocked when she saw the severity of the injury. The pediatrician opined that it was not possible for fever blisters to cause the degree of tissue decay that was present.

Bob was taken and admitted to a children's hospital for treatment to his nose. The team of specialists that evaluated him determined that surgery was not appropriate at that time.

Based on the injuries to Bob, all four of Mary and Dan's children were removed from the home.[4] Mary, Dan, Bob, and Gail all tested positive for methamphetamines at that time. Mary and Dan admitted to the recent use of methamphetamines. Mary testified that the children's positive drug tests were because of skin contact where she held the children. Mary and Dan did not test positive for drugs again after the removal of the children but did test positive for alcohol.

One of the older two children also made an outcry that at some point after Bob was returned to the home that the child saw Dan strike Bob on the head with a belt edged with rhinestones because he was not acting properly, which left a noticeable scar on Bob's head. Mary was not at home at the time.

---

[4] When this proceeding began, all four children were included. During the proceedings, the older two children were severed out and a final order was entered that placed the children with another person and named Mary and Dan as possessory conservators.

Less than a month after the removal, Bob was seen by a pediatric plastic surgeon who testified as to the severity of the injuries and that the nose injury could cause nasal collapse and other issues with breathing. The plastic surgeon was unable to determine how the injury occurred but believed that it had happened more than three weeks prior to the visit. The plastic surgeon testified that it was possible that the injury was caused by a fever blister although he had never seen that occur. Rather, the surgeon testified that similar injuries usually occur from something like a dog bite or a pressure injury in an infant. The plastic surgeon deferred reconstructive surgery to allow the injury to heal, and when he saw Bob approximately six months later determined that although the area would not completely grow back, reconstructive surgery was not needed at that time.

The plastic surgeon also evaluated Bob's cauliflower ear, which he testified is generally caused by blunt trauma, likely repeatedly, to the side of the head. The injury causes blood to collect between the cartilage and skin of the ear, which if left untreated, results in a permanent deformity of the ear. The plastic surgeon testified that the blood would need to be drained within six hours or so of the injury. The plastic surgeon further testified that the injury would be immediately noticeable when it occurred, was still very noticeable, and had likely occurred a long time ago because there was no blood in the area to drain. A surgery would be possible in a few years after Bob's ear had grown close to adult size but would be very difficult and would never restore the ear to its original shape.

Mary did not know what had caused the ear injury. Dan testified that the ear injury was caused by the trampoline fall but that the ER doctor that treated Bob's elbow did not see the injury. Dan also testified that he spoke to a doctor on the phone about the fever blister on Bob's nose and followed his recommendations but never took him to see the doctor in person.

Mary and Dan had been together for over 16 years at the time of the jury trial and there was no allegation that either was unaware of the injuries to Bob or that either of them was more at fault than the other for the reasons for which the children had been removed.

ARGUMENT AND ANALYSIS

Mary argues that there was inadequate evidence as to the extent of her drug use or evidence as to how her drug use harmed either child. Mary further argues that the evidence was legally and factually insufficient for the jury to have found that she caused any of the injuries or failed to seek medical care for Bob because there was no dispute that Bob fell off of the trampoline and there was no agreement among the experts as to what caused the septum injury. Mary also argues that the evidence that she called the nurse further shows that she did not fail to seek medical treatment.

Dan argues that even if the evidence presented by the Department as to Bob's injuries was true, "a two-month period of alleged medical neglect should not satisfy the endangering conduct standard on these facts."

The standards for legal and factual sufficiency require us to defer to the factfinder as to the credibility of the witnesses and the weight to be given to their testimony and do not allow this Court to supplant those findings with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The jury could reasonably have determined that Mary and Dan's failure to properly seek medical treatment for Bob's permanently-disfiguring injuries, taken with their failure to give him his necessary medications for his seizure disorder, overdosing him on vitamin D, failing to ensure adequate nutrition, striking Bob on the head with a belt for misbehavior resulting in a scar, using methamphetamines in such a way that both Bob and Gail tested positive for those drugs after Bob had already been removed due to the parents' methamphetamine use and returned to them only seven months before the removal in this proceeding constituted endangering conduct and that the explanations given by Mary and Dan were not credible. When we view the evidence under the proper standards for legal sufficiency and factual sufficiency, we find that the evidence was legally and factually sufficient for the jury to have found by clear and convincing evidence that Mary and Dan "engaged in conduct … which endangered the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

Further, because we have found that the evidence was legally and factually sufficient as to one predicate act necessary for the termination of their parental rights, we do not address Mary's first and third issues or the rest of Dan's first issue as to the other

predicate acts. We overrule Mary's first, second, and third issues and Dan's first issue.

**BEST INTEREST**

In Mary's fourth issue and Dan's second issue, Mary and Dan complain that the evidence was legally and factually insufficient to support the jury's finding that termination was in the best interest of the children. In determining the best interest of a child, a number of factors have been consistently considered which were set out in the Texas Supreme Court's opinion, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply lists factors that have been or could be pertinent in the best interest determination. *Id*. There is no requirement that all of these factors must be proved as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence establishing the predicate grounds under section 161.001(b)(1) also may be relevant to determining the best interest of the children. *See C.H.*, 89 S.W.3d at 27-28.

While the children were too young to express their desires, Bob's visitation with Mary and Dan had been terminated months before the jury trial at Bob's therapist's recommendation because the visits were so distressing to him and caused substantial behavioral disruptions. Neither parent ever asked the trial court for visitation with Bob to be reinstated. Conversely, both Bob and Gail were in foster homes where they were

bonded with their foster families. Bob and Gail visited with each other regularly and it was believed that the foster parents would ensure that their relationship would continue after the trial. The foster parents also ensured that Bob and Gail were able to visit with their two older siblings, although it was unclear as to whether this would continue if the older children were ever returned to Mary and Dan.

Bob was under the care of a substantial number of specialists and would require medical care and therapy for his seizures, behavioral challenges, and other issues due to the drug exposure while in utero. Although Mary testified that she would ensure that Bob's medical care continued, she was unaware as to all of his providers and did not know what special education services the school district offered at the school Bob would attend if returned to their home. Mary and Dan did have health insurance available for the children. The foster home in which Bob was placed had been able to get him medically stable during his placement with them and would continue to do so. Gail did not have any known medical issues.

Mary and Dan completed the majority of their service plan and had tested negative for all substances except for alcohol after the first positive test taken after the children's removal. They had completed the initial drug treatment, but did not complete the recommended after-care and did not attend AA/NA meetings as required in their service plan. Mary and Dan had completed individual counseling and parenting classes, but the Department and the CASA worker who was the children's guardian ad litem testified

that they did not observe that Mary and Dan demonstrated any improved parenting skills during the supervised visits with the children. There was testimony that Dan tried to get Bob to put his eye near a faucet at a water park before it came on and that he intentionally kicked a ball into tall weeds where Bob had to go get it. At one visit, Mary and Dan were observed walking ahead of 3-year-old Bob, leaving him behind to catch up, which was upsetting to Bob.

Mary and Dan were both employed and resided in a home with no mortgage that was owned by Dan. There were no concerns about the condition of the home. Mary had five different jobs during the proceedings but testified that she had left each job for another job that paid more. Mary was attempting to advance to a better position at her current employer, but also testified that she would work part-time or become a stay-at-home mom if needed to care for Bob.

There were no concerns about either foster home in which the children were placed, and both placements wanted to adopt the child placed in their home. Both had encouraged and enabled ongoing contact between Bob and Gail.

ANALYSIS

Although it is laudable that Mary and Dan have worked to complete their service plan and remained drug-free during the pendency of this proceeding, we find that the jury's finding that termination was in the best interest of the children was supported by legally and factually sufficient evidence. As stated above, evidence of improved conduct

by a parent, especially of short duration, does not conclusively negate the probative value of a parent's history of drug use and irresponsible choices. *See In re J.F.-G.*, 627 S.W.3d 304, 316-17 (Tex. 2021). This is especially true when the parents have not explained their failures or presented evidence as to what changes they would make in the future if the children were returned. Mary and Dan had regained custody of Bob after his first removal for drug use only seven months prior to this removal. During this time, Bob was deprived of necessary medications, overdosed on vitamin D, improperly fed, exposed once again to methamphetamines his parents were both using that resulted in him and Gail testing positive, and neither Mary nor Dan explained nor provided any excuses for any of it, nor have they shown that these same issues would not occur again if the children were returned to them. We overrule Mary's fourth issue and Dan's second issue.

**CONCLUSION**

Having found no reversible error, we affirm the judgment of the trial court.


TOM GRAY
Chief Justice


Before Chief Justice Gray,
    Justice Johnson, and
    Justice Smith
Affirmed
Opinion delivered and filed February 8, 2023
[CV06]

